Filed 11/5/25  P. v. Cummings CA4/1

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>CURTIS AARON CUMMINGS III,<br><br>  Defendant and Appellant. | D086176<br><br>(Super. Ct. No. RIF1903934) |

APPEAL from a judgment of the Superior Court of Riverside County, Steven G. Counelis, Judge.  Affirmed.

Marcia R. Clark, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson and Christine Y. Friedman, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Curtis Aaron Cummings III, appeals the judgment imposed following his jury trial conviction of two counts of first degree murder (Pen.

Code,[1] § 187, subd. (a)) and one count of being a felon in possession of a firearm (§ 29800, subd. (a)(1)).

Cummings raises four issues on appeal. First, he argues there was insufficient evidence to establish his liability as an actual killer or his derivative liability. There is, however, substantial evidence Cummings fired the shot that killed one of the victims and coordinated with others to carry out the drive-by killing of another victim.

Second, Cummings contends the court erred in excluding evidence that a gang member present at the time of the shooting had been recently involved in another gang-related murder. Although Cummings claims this would have proven he acted in self-defense, he did not establish that he knew the gang member or knew that the gang member had been involved in a prior murder. Moreover, any error would have been harmless because there was no evidence Cummings acted in self-defense.

Third, he asserts the trial court erred in failing to dismiss the firearms enhancements. But because Cummings was sentenced to life without the possibility of parole on each murder count, the enhancements did not "result" in a sentence over 20 years. (§ 1385, subd. (c)(2)(C).) Moreover, any error was harmless.

Finally, Cummings claims the trial court prejudicially erred in allowing into evidence statements he made to undercover agents. Cummings, however, was not aware he was speaking with undercover agents and therefore his statements do not implicate his Fifth Amendment or due process rights. Even if there had been such a violation, it was harmless beyond a reasonable doubt.

We affirm the conviction.

_____

[1]   Unless specified, further statutory references are to the Penal Code.

FACTS AND PROCEDURAL BACKGROUND

This case arises from a shooting that occurred in Moreno Valley, Riverside County in the early morning hours of August 31, 2019.

A.     *The Shooting*

Shortly past midnight, L.A. was driving home from work and stopped at a red light when she heard yelling, turned and saw a man in a sedan in the lane to her left, pointing a gun out of his passenger side window. She ducked as she saw a flash of light, and then heard numerous gunshots, felt her car get hit from the front, and saw objects flying out of the gun.

At about the same time, another witness, E.R., pulled up to the same intersection behind two SUVs when she noticed a large group of people at an ARCO gas station making gang-type hand gestures and yelling towards one of the SUVs. She then heard four to eight gunshots coming from near one of the SUVs and saw the barrel of a rifle, muzzle flashes and smoke coming from its passenger window.

Sheriff's deputies responded to the scene and found one gunshot victim at the ARCO gas station and another gunshot victim in a parking lot nearby. Both were deceased.

B.     *The Investigation*

Cummings was arrested a few weeks later and his phone was seized. Forensic analysis showed he visited multiple webpages about the shooting and Moreno Valley's "most wanted." The day after the shooting, Cummings sent a message to his boss asking for days off. A couple of days later, he sent a message to a friend stating he was in Las Vegas and inviting her to visit him. He also sent a message to his ex-wife indicating he was in Arizona and asking her, "Is anyone looking for me?" When his ex-wife asked him if he was

in trouble and needed a phone, he responded he would need one when he got back.

Investigators tested Cummings's car[2] for the presence of gunshot residue and found a particle or particles commonly associated with gunshot residue and/or a particle or particles consistent with gunshot residue. Exterior surveillance video footage from the ARCO gas station showed Cummings's sedan pull up next to two SUVs. A few women at the gas station made hand gestures toward the street and a man walked toward the street while a group came out of the convenience store and walked toward the street. Shortly thereafter, one SUV backed up, Cummings's sedan pulled forward, and there was a muzzle flash from his sedan. Then there was a muzzle flash from the SUV, which quickly reversed, and then drove forward as there was another muzzle flash.

The individuals at the ARCO gas station instantly reacted to the muzzle flash from Cummings's sedan. One of the gunshot victims fell near the gasoline pumps, and people ran and ducked for cover. The other victim ran away from the street through the parking lot before collapsing in another area.

During their investigation, detectives directed an investigative technique known as a *Perkins* operation,[3] where Cummings was placed with undercover agents in a holding cell. Cummings made self-incriminating statements in this *Perkins* operation, as described below.

---

[2]    Video footage of the ARCO gas station included a view of the license plate of the sedan, which established that Cummings was the registered owner of the vehicle.

[3]    The term "*Perkins* operation" derives its name from *Illinois v. Perkins* (1990) 496 U.S. 292 (*Perkins*), discussed *post*.

C.     *Cummings was Charged, Convicted and Sentenced*

In December 2020, Cummings was charged with two counts of murder. The information also alleged he (1) personally and intentionally discharged a firearm and proximately caused great bodily injury and death (§§ 12022.53, subd. (d), 1192.7, subd. (c)(8)); (2) intentionally discharged a firearm from a motor vehicle at another person outside the vehicle with the intent to inflict death (§ 190.2, subd. (a)(21)); and (3) intentionally killed the victim being an active participant in a criminal street gang, and the murder was carried out to further the activities of the criminal street gang (§ 190.2, subd. (a)(22)). It further alleged Cummings committed murder in the first degree and one or more additional murders in the first or second degree (§ 190.2, subd. (a)(3)). Finally, it alleged Cummings had served two prior prison terms (§ 667.5, subd. (b)) and had been convicted of a serious felony (§ 667, subd. (a)) and a prior strike (§§ 667, subds. (c), (e)(1), 1170.12, subd. (c)(1)).

A jury convicted Cummings on all counts and found true all the enhancements and special circumstances.  With respect to the murder counts, the jury fixed the degree of murder as murder in the first degree.  Cummings waived his right to a jury trial on the prior conviction allegations.  The prior prison term allegations (§ 667.5, subd. (b)) were struck upon motion by the prosecution.  The trial court found true that Cummings had been convicted of a serious felony and a prior strike.

The trial court sentenced Cummings to:  (i) life without the possibility of parole plus 25 years to life for the firearm enhancement on the first murder count; (ii) a consecutive sentence of life without the possibility of parole plus 25 years to life for the firearm enhancement on the second murder count; and (iii) a stayed four-year sentence for possessing a firearm

5

as a felon.  The court also imposed a five-year determinate sentence for the serious felony prior (§ 667, subd. (a)).

DISCUSSION

I.

*The Convictions Are Supported by Sufficient Evidence*

Cummings contends there was insufficient evidence that he was the actual killer of either victim or that he was liable for murder under the theories of aiding and abetting, conspiracy, or the provocative act theory.  We disagree.

A.    *Standard of Review*

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]  We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.]' " (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890.)  A reviewing court does not reweigh the evidence or reevaluate the credibility of witnesses in reviewing a claim of insufficiency of the evidence. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1129.)  "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

"Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence." (*In re Michael D.* (2002) 100 Cal.App.4th 115, 126.)  "Although it is the jury's duty to acquit a

6

defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt.  [Citation.]  ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant reversal of the judgment.  [Citation.]" ' "  (*People v. Kraft* (2000) 23 Cal.4th 978, 1053–1054.)

B.     *Sufficient Evidence of Direct Liability as to the First Victim*

There was sufficient evidence Cummings was the actual killer of one victim (first victim).  Cummings stipulated he was the only occupant of the sedan at the time of the incident.  The surveillance video showed a victim dropping to the ground just as the muzzle flash appeared from his sedan.  The jury could reasonably conclude Cummings fired the first shot because the video does not show anyone reacting earlier.

There was also sufficient evidence for a reasonable juror to infer Cummings fired both the bullet found in the crosswalk of the intersection as well as the bullet that killed the first victim.  Forensic analysis of the bullet recovered from the first victim's skull determined that it was fired either from the same gun that fired the bullet located in the crosswalk near L.A.'s car or from a different gun with a barrel that was "machined by the same tool while that tool was in the same approximate state of wear."  L.A. testified she saw a Black man in the sedan next to her, pointing a gun out of the passenger side window.  She ducked and saw a flash of light from the sedan, heard a lot of gunshots, felt her car get hit from the front, and saw a flash of light from the sedan along with objects flying out of the gun.  There were

7

defects on the radiator of L.A.'s car, and smoke could be seen coming from the bottom of her car after Cummings drove off.

C. *Sufficient Evidence of Derivative Liability as to the Second Victim*

Cummings contends there was insufficient evidence he collaborated with the occupants of the SUVs in the murder of the second victim and therefore he cannot be held liable for their independent acts. We disagree.

1. *Relevant Law*

"[A]ider and abettor liability requires proof in three distinct areas: (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime." (*People v. Perez* (2005) 35 Cal.4th 1219, 1225.) "Among the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense." (*In re Lynette G.* (1976) 54 Cal.App.3d 1087, 1094; see also *In re Jose T.* (1991) 230 Cal.App.3d 1455, 1460 ["Neither mere presence at the scene of a crime, nor the failure to take steps to prevent a crime, is alone sufficient to establish that a person is an aider and abettor. Such evidence may, however, be considered together with other evidence in determining that a person is an aider and abettor."].)

Alternatively, "[c]onspiracy requires two or more persons agreeing to commit a crime, along with the commission of an overt act, by at least one of these parties, in furtherance of the conspiracy. [Citations.] A conspiracy requires (1) the intent to agree, and (2) the intent to commit the underlying substantive offense. [Citation.]" (*People v. Bogan* (2007) 152 Cal.App.4th

8

1070, 1074.) " 'The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy. [Citation.]' " (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1135.)

In *People v. Sanchez* (2001) 26 Cal.4th 834, the California Supreme Court upheld the first degree murder conviction of a defendant who had engaged in a gang-related shootout that left an innocent bystander dead. Though it was unclear whether the defendant or a rival gang member had fired the fatal shot, the Supreme Court held that the defendant's "commission of life-threatening deadly acts in connection with his attempt on [the rival gang member's] life was a substantial concurrent, hence proximate, cause of [the victim's] death." (*Id.* at pp. 848–849.) In *People v. Carney* (2023) 14 Cal.5th 1130, the California Supreme Court confirmed that "*Sanchez* establishes that the conduct of a participant in a gun battle who did not fire the fatal shot may contribute substantially and concurrently to—and be a proximate cause of—the victim's death." (*Id.* at p. 1137.) The court explained that *Sanchez* did not articulate a new theory of causation—"[r]ather, the term 'substantial concurrent cause' embraces familiar causation concepts of substantial factor and concurrent cause." (*Id.* at p. 1141.)

When there is evidence of concurrent causes, " '[t]o be considered the proximate cause of the victim's death, the defendant's act must have been a substantial factor contributing to the result, rather than insignificant or merely theoretical.' " (*People v. Jennings* (2010) 50 Cal.4th 616, 643.) " '[A] cause is concurrent if it was "operative at the time of the murder and acted with another cause to produce the murder." ' " (*Carney, supra,* 14 Cal.5th at p. 1139.) " '[A]s long as the jury finds that without the criminal act the death would not have occurred when it did, it need not determine

9

which of the concurrent causes was the principal or primary cause of death.' " (*Jennings*, at p. 643.)  The act of another may constitute a superseding cause relieving the initial actor of criminal liability "if the other's conduct is both unforeseeable and causes harm that was not the foreseeable consequence of the initial actor's conduct."  (*People v. Brady* (2005) 129 Cal.App.4th 1314, 1328.)

### 2.    *Evidence of Collaboration*

Cummings argues that "all three vehicles wound up traveling to the intersection at the same time by sheer coincidence—not by design," and that the individuals in the two SUVs independently reacted to the threat posed by the gang members at the ARCO gas station.  But Cummings ignores evidence he worked with the occupants of the two SUVs to carry out the drive-by shooting.

Prior to the shooting, all three vehicles (Cummings's sedan and two SUVs, one red and one black) were parked near a bar where gang members were known to congregate.  The two SUVs pulled out of the parking lot before Cummings but got separated from each other because of vehicle traffic and pedestrians.  The black SUV then pulled into another parking lot, waited for the red SUV to catch up, and then both cars proceeded back onto the road.  Cummings's sedan quickly approached the two SUVs and stopped to the left of them at a traffic light.

At the intersection where the shooting took place, the black SUV moved into the first left-turn lane in front of the red SUV, while Cummings's sedan stayed in the second left-turn lane.  The black SUV stopped short of the crosswalk.  Cummings's sedan also stopped short of the intersection and slightly behind the black SUV.  But then Cummings slowly pulled his car forward so that his car was even with the black SUV.  When L.A.'s car pulled

10

up in the lane next to Cummings's sedan, Cummings's sedan quickly pulled forward, turning slightly to the right, and stopped.

When the light turned green, a white car two lanes to the right of Cummings proceeded forward while his sedan and the black SUV paused. A couple of seconds later, Cummings's sedan drove forward, there was a muzzle flash, and then the sedan proceeded to turn left. Immediately after the muzzle flash from Cummings's sedan, video captured a couple of muzzle flashes from the red SUV. E.R. also saw a rifle protruding out of the black SUV's window and muzzle flashes and smoke. The movement of the vehicles supports an inference that the vehicles' occupants acted in coordination, rather than by coincidence.

There also was evidence the drive-by shooting was gang related. Before the shooting, Cummings and the individuals in the SUV were parked outside a bar frequented by Sex Cash gang members. During the *Perkins* operation, Cummings revealed he knew some individuals at the ARCO gas station were "East Side Riverside 1200 Block Crip" (East Coast Crips). The East Coast Crips were rivals of the Sex Cash gang, and the intersection where the shooting took place was in Sex Cash territory. An expert testified gang members know it is their job to protect their turf, with violence if necessary, and there is an expectation gang members will back each other up. Posed with a hypothetical mirroring the facts of this case, the expert opined the shootings targeted rival gang members and were committed to benefit the Sex Cash gang.

Accordingly, there was sufficient evidence for the jury to conclude Cummings and the individuals in the SUVs had a shared intent to shoot and kill rival gang members at the ARCO gas station and coordinated their efforts to achieve that goal. Similarly, the evidence was " ' " 'sufficient to

11

prove a conspiracy' " ' " because it " ' " ' "support[ed] an inference that [Cummings and the individuals in the SUVs] positively or tacitly came to a mutual understanding to commit a crime." ' " ' " (*People v. Lamb* (2024) 16 Cal.5th 400, 442.)

Furthermore, the evidence supported a finding Cummings's actions were a " 'substantial concurrent cause' " of the deaths of the victims. (See *Carney, supra*, 14 Cal.5th at pp. 1137–1145.) A jury could reasonably infer from the surveillance video, L.A.'s testimony, and projectile evidence, that Cummings initiated the deadly attack by firing the first shot out his window. Once Cummings fired his gun, his fellow gang members in the SUVs backed him up by firing their weapons as well. Accordingly, even if Cummings did not fire the shots that killed the second victim, his actions were the proximate cause of his death. (*Id.* at pp. 1144–1145.)

*People v. Kemp* (1957) 150 Cal.App.2d 654, is instructive. There, two cars were racing and one of the racers collided with another car. (*Id.* at p. 659.) The Court of Appeal explained the non-colliding car was a concurring proximate cause of the accident: "They were both violating several laws, the acts of both led directly to and were a proximate cause of the result, and the fact that the appellant happened to narrowly escape the actual collision is not the controlling element. The evidence is sufficient to show that they were not acting independently of each other, and that they were jointly engaged in a series of acts which led directly to the collision." (*Ibid.*)

Similarly, Cummings and the individuals in the SUVs are equally culpable because they jointly engaged in deadly gunfire. (See *Sanchez, supra*, 26 Cal.4th at p. 854 [" 'Because defendant and [his codefendant] had equally culpable mental states and engaged in precisely the same conduct at the same time and place in exchanging shots, it is not unfair to hold them equally

12

responsible for [the victim's] death, without regard to which of them actually fired the bullet that struck and killed [the victim].' "].)[4]

## II.

### *The Trial Court Properly Excluded Irrelevant Evidence*

Cummings asserts he "acted in self-defense, believing that the crowd of gang members who approached his car, shouting and throwing gang signs, were armed and likely to shoot." He argues the trial court erred in excluding evidence that one of the gang members at the ARCO gas station was involved "in a gang-related murder committed shortly before this shooting" and admitted "to being a member of the East Coast Crips and [having a] habit of always wearing a gun." Cummings claims this evidence "would have shown the jury that the danger posed in this case was not just theoretical, and that the parties involved here made that danger not just a possibility but a likelihood."

"As a general matter, the '[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense.' " (*People v. Fudge* (1994) 7 Cal.4th 1075, 1102–1103.) "Although completely excluding evidence of an accused's defense theoretically could rise

---

[4] In this case, the jury was given instructions on provocative act murder, and the prosecutor referred to that doctrine during closing argument. Cummings argues, and the Attorney General concedes, it is inapplicable to the facts of this case. We agree. Nevertheless, because Cummings's murder convictions rested on one or more legally sufficient theories, and that the record does not affirmatively demonstrate the jury relied on an unsupported theory in reaching its verdict, any error in instructing the jury on provocative act murder was harmless. (*People v. Johnson* (1993) 6 Cal.4th 1, 42 ["[I]f one of the prosecution's alternative theories of criminal liability is found unsupported by the evidence, the judgment of conviction may rest on any legally sufficient theory unaffected by the error, unless the record affirmatively demonstrates that the jury relied on the unsupported ground"].)

13

to this level, excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense." (*Id.* at p. 1103.)  Under state law, "only relevant evidence is admissible" and trial courts are vested with broad discretion to determine relevance.  (*People v. Kelly* (1992) 1 Cal.4th 495, 523.)  Under Evidence Code section 352, even relevant evidence is inadmissible "if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice . . . ."

"The court's ruling will not be disturbed unless made 'in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Powell* (2018) 6 Cal.5th 136, 162.)  A " 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836.)  Where a court's exclusion of defense evidence is erroneous under state law but does not deprive a defendant of his constitutional right to present a defense, prejudice is assessed under the *Watson* standard.  (*Fudge, supra*, 7 Cal.4th at p. 1103.)

In ruling on Cummings's motion to admit the evidence and the People's motion to exclude it, the court observed that it did not "see anything in the video that suggests [the gang member] was involved with provoking or creating a scenario which would justify the use of deadly force in self-defense by [Cummings]."  Additionally, in denying Cummings's request that the gang member's statements be admitted into evidence, the court made "a preliminary-fact determination that there's no self-defense that would justify the use of a firearm by [Cummings] based upon the video."

14

The court did not abuse its discretion.  Cummings failed to establish that before the murders in this case, he knew who the gang member was or had heard about his involvement in the prior gang-related shooting or his reputation for violence.  (*People v. Tafoya* (2007) 42 Cal.4th 147, 165 ["When, as here, the relevance of proffered evidence depends upon the existence of a foundational fact, the proffered evidence is inadmissible unless the trial court determines it 'is sufficient to permit the jury to find the preliminary fact true by a preponderance of the evidence.' "].)  If he didn't have such prior knowledge, he could not have formed a belief that the people in the parking lot posed a danger to him.

Moreover, even if the court erred, the error would have been harmless because there was no evidence Cummings feared for his life, that anyone at the ARCO gas station threatened his life or that he acted in self-defense.  The individuals at the ARCO gas station never stepped past the curb, while Cummings was in a car, four lanes away, with cars between himself and the curb.  During the *Perkins* operation, Cummings said he could not see because it was "too dark" and "too far away," and the individuals "stopped at the curb" and he could have "just drove off."  There was no video or testimony establishing anyone at the ARCO gas station displayed a gun, and no guns or ammunition were found on the individuals at the scene.  When Cummings was asked if he saw anybody with a gun, he said, "I couldn't see . . . , it was dark."

On the contrary, all the evidence indicated Cummings was the aggressor.  He maneuvered his car to get a better angle by pulling forward and to the right, closer to the ARCO gas station, after L.A.'s car pulled up next to him and blocked his view.  Then he yelled out his open passenger side

15

window.  Before firing shots, he waited for the light to turn green and the cars to his right to move out of the way.

III.

*Trial Court Did Not Err in Refusing to Strike the*
*Firearm Enhancements*

Cummings contends the trial court abused its discretion in refusing to strike the firearm enhancements.  He argues "the imposition of sentence for those enhancements resulted in the addition of over 20 years, a factor required to be given great weight in determining whether to dismiss an enhancement pursuant to section 1385, subdivision (c)(2)(C)."  He further asserts the court never explained how he "could pose a danger to public safety if those enhancements were dismissed when the court had imposed two consecutive sentences of life without the possibility of parole."  According to Cummings, his "two consecutive sentences of life without the possibility of parole ensured that he could not pose a danger to public safety."

At the sentencing hearing, the trial court referred to section 1385, subdivision (c)(2)(C), and explained that although the mitigating circumstance applied, the court found that dismissing the firearm enhancements would endanger public safety.  The court explained that because Cummings was previously convicted of being a member of a criminal street gang and the jury in this case returned true findings on the gang special circumstance, there was a strong likelihood that absent imposition of the firearm enhancements, physical injury to others would continue.  The court also declined to exercise its discretion to impose a lesser firearm enhancement.  The court explained, "The facts in this case are precisely the conduct which the Legislature intended to punish by passing and the governor signing the law that put into effect [section] 12022.53, [subdivision] (d)."

16

Section 1385, subdivision (c)(2)(C) only applies when "[t]he application of an enhancement could result in a sentence of over 20 years." Even absent the firearm enhancements, Cummings's sentence on each of the murder counts was life without the possibility of parole. Therefore, application of the firearm enhancements did not "result" in a sentence of over 20 years, and subdivision (c)(2)(C) did not weigh greatly in favor of dismissing the enhancements. (See Couzens et al., Sentencing California Crimes (The Rutter Group 2023) § 12:11 ["There will be no entitlement to relief unless it is the application of the term for the enhancement that results in a sentence of longer than 20 years"].)

Even assuming section 1385, subdivision (c)(2)(C) applied and the trial court erred in determining that dismissal of the enhancements would endanger public safety, the error was harmless. The trial court still had discretion to impose a sentence it determined to be "in the furtherance of justice." (*People v. Walker* (2024) 16 Cal.5th 1024, 1036 ["ultimately, the court must determine whether dismissal is in furtherance of justice"].) In *Walker*, the California Supreme Court rejected the proposition that section 1385's mandate to "afford great weight" to mitigating circumstances erects a rebuttable presumption in favor of dismissing the enhancement that can be overcome only by a finding that dismissal would endanger public safety. (*Id*. at p. 1033.) The Court explained, "notwithstanding the presence of a mitigating circumstance, trial courts retain their discretion to impose an enhancement based on circumstances 'long deemed essential to the "furtherance of justice" inquiry.'" (*Ibid*.)

Here, the court explained that if the Legislature granted trial courts additional discretion to lessen sentences, it would decline to exercise such discretion because the imposed sentence was the appropriate one under the

facts of this case. Cummings's conduct was of "the utmost dangerousness" and could have resulted in the deaths of many other people. It could not find that there were any provocative acts by the group of people at the ARCO gas station that justified the shootings. "From my view of the evidence, it was completely an unprovoked attack by Mr. Cummings, his associates in the other vehicles." The court concluded: "So far all of those reasons, I decline to exercise any future discretion. I find today's sentence to be wholly appropriate. I would decline any future discretion given to me by any court, by any decision, by any statute."

Accordingly, any error in the trial court's reasoning as to whether dismissal of the enhancements would endanger public safety was harmless.

IV.

*The Perkins Operation Did Not Violate Cummings's Fifth Amendment or Due Process Rights*

Cummings argues the continuation of the *Perkins* operation after he invoked his right to remain silent violated his Fifth Amendment right against self-incrimination and his right to due process under the Fourteenth Amendment. We disagree.

A.     *The Perkins Operation*

Following his arrest, Cummings was placed in a holding cell with six undercover agents, although various agents were pulled out of the cell at different times. Cummings and the agents were all wearing orange jumpsuits. The operation was recorded and monitored and lasted close to five hours. Subtracting the time periods when Cummings was pulled out of the cell, he was in the cell with the agents for about three hours and 40 minutes.

Shortly after the *Perkins* operation began, an investigator entered the holding cell and told Cummings they finished processing his car and found gunshot residue on the inside ceiling. In fact, the test had not yet been

18

processed. Once the investigator left the cell, the undercover agents talked about the gunshot residue, and Cummings said, "Man, it's over." In response to a question as to whether anyone was able to see directly in his car, Cummings said, "No, I was kinda far, man. I didn't [inaudible] I don't know, bro."

The undercover agents then suggested Cummings could argue self-defense, and that he was in a new car and would have had to defend himself if these other men came at him. When asked where the other men were from, Cummings replied, "East Coast, I don't know though." When asked if anyone could see him, Cummings replied, "I don't know. I couldn't see . . . , it was dark." He responded, "Mm-mm. Nah," when questioned if anybody caught a glimpse of him during the shootings.

At this point, Cummings had been in the cell for approximately two hours. He was then removed for an interview, during which *Miranda*[5] advisements were given. After Cummings was read his rights, he invoked them. The investigator did not ask Cummings any more questions, and he was placed back in his cell.

The undercover agents continued their questioning. When asked where all the men were coming from, Cummings answered, "The dude walked this way, he came back. [¶] . . . [¶] They stopped at the curb, though. [¶] . . . [¶] All the . . . , all—whoever was coming, you feel me? [¶] . . . [¶] [inaudible] back [inaudible] they stopped though." The agent pointed out Cummings was outnumbered and had to protect himself. Cummings said, "[inaudible] have just drove off." The agent replied, "Yeah, I guess." Cummings said, "You see what I'm saying?" The agent wondered if that was really an option or if he

---

5      *Miranda v. Arizona* (1966) 384 U.S. 436.

would have had to turn around or if he was trapped. Cummings replied, "No, I'm just driving to [inaudible]."

Cummings was also asked how he felt about self-defense. Cummings responded, "The way it came, I mean yeah, but it's like, they did stop at the curb." The agent questioned whether the distance between the men and Cummings was closer than the two of them. Cummings said, "Yeah way further." An agent expressed hope Cummings got rid of the "mother[ ]" [i.e. the gun] and did not give it to anybody else because at the end of the day, that would be a big piece of their case. Cummings responded, "They need that, huh." An agent said, "That's why I asked you, . . . . Is you sure you got rid of it, or gave it to one of your . . . ?" Cummings replied, "It's gone now." Later, an agent asked, "And you're 100 [percent] confident they can't find it." Cummings said, "Mm-hmm." He then reiterated it was "gone."

Before trial, Cummings filed a motion to exclude the statements he made during the *Perkins* operation, both before and after he invoked his *Miranda* rights and the People filed a motion to admit them. In his motion, Cummings attempted to distinguish the facts of his case from *Perkins, supra*, 496 U.S. 292, and argued that *Perkins* was wrongly decided. He also argued he was subjected to the functional equivalent of interrogation after invoking his *Miranda* rights and that the "extreme deception" violated his right to due process under the Fourteenth Amendment.

At a hearing on the motion, the prosecutor called an investigator to testify about the *Perkins* operation. The investigator described the environment of the cell as consisting of "locker-room talk," including laughing and joking around. There were no visible signs Cummings feared the agents, and he never complained to the investigators or officers he feared them. The

investigator did not observe the agents act aggressively or coercively toward Cummings.

After hearing the testimony and argument, the court admitted Cummings's statements.  The court explained that under *Perkins*, the law was sufficiently clear that there was no *Miranda* violation.  The court further determined there was nothing in the record to support a finding of coercion or a due process violation.  The court observed the environment in the cell appeared sociable—"They discussed things of mutual interest within the cell, whatever those topics were, and any statements made by the defendant in that context were clearly voluntary."

B.   *Standard of Review*

In determining whether a trial court erred in denying a motion to suppress a defendant's statements, " ' " [w]e independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained.' " ' "  (*People v. Jackson* (2016) 1 Cal.5th 269, 339.)

C.   *Cummings Did Not Establish His Fifth Amendment or Due Process Rights Were Violated*

In *Miranda*, the Court held "the Fifth Amendment privilege against self-incrimination prohibits admitting statements given by a suspect during 'custodial interrogation' without a prior warning."  (*Perkins, supra*, 496 U.S. at p. 296.)

In *Perkins* the Court limited the reach of *Miranda* by stating that "[c]onversations between suspects and undercover agents do not implicate the concerns underlying *Miranda*" (*Perkins, supra*, 496 U.S. at p. 296) and then expressly holding "that an undercover law enforcement officer posing as a fellow inmate need not give *Miranda* warnings to an incarcerated suspect before asking questions that may elicit an incriminating response."  (*Id.* at

21

p. 300.)  In so holding, the Court explained that "[t]he essential ingredients of a 'police-dominated atmosphere' and compulsion are not present when an incarcerated person speaks freely to someone whom he believes to be a fellow inmate."  (*Id.* at p. 296.)  "When a suspect considers himself in the company of cellmates and not officers, the coercive atmosphere is lacking."  (*Ibid.,* citing *Miranda, supra*, 384 U.S. at p. 449.)

Expounding further on this reasoning, the Court in *Perkins* observed that "[t]here is no empirical basis for the assumption that a suspect speaking to those whom he assumes are not officers will feel compelled to speak by the fear of reprisal for remaining silent or in the hope of more lenient treatment should he confess."  (*Perkins, supra*, 496 U.S. at pp. 296–297.)  Whereas "[q]uestioning by captors, who appear to control the suspect's fate, may create mutually reinforcing pressures that the Court has assumed will weaken the suspect's will, . . . [w]hen the suspect has no reason to think that the listeners have official power over him, it should not be assumed that his words are motivated by the reaction he expects from his listeners."  (*Id.* at p. 297.)  Inasmuch as "*Miranda* forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust in one he supposes to be a fellow prisoner[,] . . . [p]loys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns."  (*Ibid.*)  On the basis of this reasoning, the Court stated that "*Miranda* was not meant to protect suspects from boasting about their criminal activities in front of persons whom they believe to be their cellmates" (*Id.* at p. 298) and that, in situations in which "the suspect does not know that he is speaking to a government agent[,] there is no reason to assume the possibility that the suspect might feel coerced."  (*Id.* at p. 299.)

Nevertheless, once a suspect has invoked his right to counsel, officers may not further interrogate him until counsel is made available unless the suspect initiates further communication.  (See *Edwards v. Arizona* (1981) 451 U.S. 477, 484–485 (*Edwards*).)  An interrogation includes "express questioning" and "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (*Rhode Island v. Innis* (1980) 446 U.S. 291, 301.)  "The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police."  (*Ibid*.)

"California courts have uniformly come to the conclusion that *Perkins* [not *Edwards*] controls when a suspect invokes his *Miranda* right to counsel but later speaks with someone he does not know is an agent of the police." (*People v. Orozco* (2019) 32 Cal.App.5th 802, 815 (*Orozco*).)  The court reasoned that *Edwards* places restrictions on "further interrogation by the authorities" after invocation of the right to counsel (*Edwards, supra*, 451 U.S. at pp. 484–485), and "[i]mplicit in the definition of 'interrogation,' " as used by *Miranda*, "is that (1) the suspect is talking to the police or an agent of the police, *and* (2) the suspect is *aware* that he is talking to the police or one of their agents." (*Orozco*, at p. 813.)  The court explained that because " '[t]he essential ingredients of a "police-dominated atmosphere" and compulsion are not present when an incarcerated person speaks freely to someone' that he thinks is a lover, a family member, a friend or even a fellow criminal . . . *Miranda's* (and, by extension, *Edward's*) purpose in combating that atmosphere and compulsion is simply not implicated in such situations." (*Id*. at p. 814.)

*Orozco* is well reasoned, and we follow it here. Both before and after Cummings invoked his right to remain silent, he freely spoke with the other men in the cell, believing they were fellow inmates. Accordingly, his statements were not the result of police interrogation within the meaning of *Miranda*, and they were not obtained in violation of his Fifth Amendment rights.

Nor were Cummings's due process rights violated. In *Orozco*, the court rejected the defendant's due process claim because "[d]ue process requires coercion" and the defendant's statements to his girlfriend were not coerced. (*Orozco, supra*, 32 Cal.App.5th at p. 819.) The court went on to state that absent a showing that the police conduct independently violated due process, "defendant is effectively asking us to expand *Miranda* under the aegis of due process. This we may not do . . . ." (*Id.* at p. 820.) Here, as in *Orozco*, there is no evidence of coercion to support a due process claim.[6]

D.  *Any Error was Harmless*

Even if continuation of the *Perkins* operation after Cummings invoked his right to remain silent violated his *Miranda* and/or due process rights, any error was harmless beyond a reasonable doubt. (See *Chapman v. California* (1967) 386 U.S. 18, 24.)

The evidence established Cummings was the sole occupant of his car on the night of the shootings and fired a gun toward the individuals at the ARCO gas station. Surveillance video tracked the movements of his car prior to the shootings and showed the driver was the only person in the sedan.

---

[6]  We are aware the California Supreme Court has granted review of this issue in *People v. Allen* (July 22, 2024, B328333) [nonpub. opn.] review granted Nov. 20, 2024, S286520. Nevertheless, because we follow *Orozco, supra*, 32 Cal.App.5th 802, we reject Cummings's argument that his rights were violated.

After the shootings, Cummings obtained a new phone and visited multiple web pages about the shooting and Moreno Valley's "most wanted." Exhibiting consciousness of guilt, Cummings also promptly left town and went to Las Vegas. In communications with his ex-wife, Cummings asked if anyone was looking for him, and when she asked if he was in trouble and needed a phone, he responded that he would need one when he got back.

During the *Perkins* operation, prior to invoking his right to remain silent, Cummings made statements indicating he was there on the night of the shootings. He confirmed the video captured his car and that "usually I be drivin'." He stated, "Man, it's over," after an investigator told him the inside of his car had gunshot residue.

Additionally, as discussed above, there was no evidence supporting Cummings's claim of self-defense. Prior to invoking his right to remain silent, when an agent asked if anyone was able to see directly into his car, he replied, "No, I was kinda far, man." Instead, all the evidence demonstrates Cummings was the aggressor.

Accordingly, even if we had found Cummings's Fifth Amendment or due process rights were violated, it would not result in a more favorable result for him.

## DISPOSITION

The judgment is affirmed.


KELETY, J.

I CONCUR:


HUFFMAN, J.*

---

\* Retired Associate Justice of the Court of Appeal, Fourth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

BUCHANAN, J., Concurring.

I join the majority opinion except for section IVC. For the reasons explained by Justice Stratton in her dissenting opinion in *People v. Felix* (2024) 100 Cal.App.5th 439, 453–455, I believe it was impermissible for law enforcement to use the ruse of a *Perkins* operation to continue interrogating Cummings in jail immediately after he invoked his *Miranda* rights. After a suspect has invoked his *Miranda* rights, no police-initiated interrogation, coercive or otherwise, may occur unless there has been a break in custody and the suspect has given a voluntary, knowing, and intelligent waiver of the *Miranda* rights previously invoked. (*Maryland v. Shatzer* (2010) 559 U.S. 98, 103–112; *Edwards v. Arizona* (1981) 451 U.S. 477, 482–486; *People v. Bradford* (1997) 14 Cal.4th 1005, 1034.) The police must scrupulously honor the suspect's invocation. (*Michigan v. Mosley* (1975) 423 U.S. 96, 104; *People v. Krebs* (2019) 8 Cal.5th 265, 314.) Deliberately tricking a suspect who has just invoked his *Miranda* rights into speaking with an undercover agent of law enforcement while the suspect is still in uninterrupted custody without counsel does not scrupulously honor the suspect's invocation and cannot be counted as a voluntary, knowing, and intelligent waiver of the rights previously invoked.

I would therefore conclude that the trial court erred by admitting into evidence the statements Cummings made to the *Perkins* agent after he invoked his *Miranda* rights. I concur in the result, however, because I agree with the majority that any error in admitting those statements was harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18, 24.

BUCHANAN, Acting P.J.